# EXHIBIT B

**STATE OF NORTH CAROLINA**

**COUNTY OF MECKLENBURG**

**IN THE GENERAL COURT OF JUSTICE**
**SUPERIOR COURT DIVISION**

26CV029688-590

**LEQUANDA BETHEA,**

**Plaintiff**

v.

**LYFT, INC.,**

**Defendant.**

**COMPLAINT**
**[Jury Trial Demanded]**

> **NOW COMES** Plaintiff, LEQUANDA BETHEA ("Plaintiff"), by and through undersigned counsel, complaining of Defendant LYFT, INC. ("Lyft") and hereby alleges and states as follows:

## NATURE OF THE ACTION

1.      This action arises from Lyft's longstanding systemic failure to protect the passengers it publicly assures are safe when using its platform, through Lyft's negligent hiring, supervision, and retention; its deceptive safety representations; its defective and misleading app design; its refusal to implement basic safety measures; and its conscious, profit-driven disregard of the foreseeable risk that its drivers would harass, assault, and prey upon women like Plaintiff.

2.      Plaintiff was verbally harassed, degraded, sexually propositioned, assaulted, and battered by a Lyft driver whom Lyft selected, authorized, and placed in control of Plaintiff's ride through the Lyft App.

3.      Lyft publicly portrays itself as a company committed to safety, publishing policies, community guidelines, and reports that purport to take sexual assault and harassment seriously. In reality, those materials operate as marketing tools designed to reassure the public, expand Lyft's profits, obscure systemic reporting barriers, shield Lyft from accountability, and leave victims without meaningful recourse.

4.      Lyft deliberately chooses to prioritize the maximization of growth and profits at the expense of its unassuming customers.

5.      Lyft pairs strangers in enclosed vehicles, places riders in vulnerable positions, controls the platform through which drivers gain access to passengers, holds itself out as a safe transportation provider, and profits from every ride.

1

6. Despite being a multi-billion-dollar corporation with advanced technological capabilities, Lyft has failed to adopt, implement, and enforce safety measures adequate to protect passengers from sexually predatory, coercive, and assaultive conduct by Lyft drivers operating through Lyft's platform.

7. Plaintiff brings this action to recover compensatory, general, special, and punitive damages for the personal injuries, emotional distress, and other losses she suffered as a result of the Lyft driver's sexual misconduct and Lyft's negligence, gross negligence, and willful disregard for passenger safety.

8. Plaintiff also seeks to expose the gap between Lyft's public safety promises and its actual practices and to hold Lyft accountable for placing its profits above the safety, dignity, and bodily autonomy of the passengers who rely on its transportation services.

## PARTIES

9. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

10. Plaintiff is a natural person, over the age of eighteen, and a resident of Mecklenburg County, North Carolina.

11. At all relevant times, Plaintiff was a Lyft passenger being transported to her home.

12. Lyft is, upon information and belief, a Delaware corporation with its corporate headquarters, principal office, and principal place of business located at 185 Berry Street, San Francisco, California.

13. Upon information and belief, Lyft may be properly served through its registered agent, CT Corporation, located at 160 Mine Lake Court, Suite 200, Raleigh, NC 27615.

## JURISDICTION AND VENUE

14. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

15. This Court has subject matter jurisdiction under N.C. Gen. Stat. § 7A- 240 and § 7A-24 as the Court is one of general jurisdiction, and the amount in controversy exceeds $25,000.

16. Upon information and belief, Lyft is registered and authorized to transact business in North Carolina, has obtained a certificate of authority from the North Carolina Secretary of State pursuant to N.C. Gen. Stat. § 55-15-01, and has appointed a registered agent for service of process

2

in North Carolina pursuant to N.C. Gen. Stat. § 55-15-07, as identified in Paragraph 13 of this Complaint.

17.     As a registered foreign corporation authorized to transact business in North Carolina, Lyft is subject to the same duties, restrictions, penalties, and liabilities imposed on a domestic corporation of like character under N.C. Gen. Stat. § 55-15-05(b).

18.     As such, Lyft is treated as a domestic corporation for purposes of determining personal jurisdiction and is therefore subject to the Court's personal jurisdiction under N.C. Gen. Stat. § 1-75.4(1)(c).

19.     By obtaining and maintaining a certificate of authority to transact business in North Carolina and appointing a registered agent for service of process under N.C. Gen. Stat. §§ 55-15-01 and 55-15-07, Lyft has also consented to general personal jurisdiction in North Carolina.

20.     Personal jurisdiction over Lyft is also proper under North Carolina's long-arm statute, N.C. Gen. Stat. § 1-75.4(1)(d), and comports with due process of law because Lyft has engaged in "substantial activity" in North Carolina "whether interstate, intrastate or otherwise."

21.     Lyft's substantial activity in North Carolina includes but is not limited to:

    a.  Operating a statewide transportation network platform that matches North Carolina residents with Lyft drivers for paid rides originating, occurring, and/or terminating within the State;

    b.  Maintaining, marketing, and deploying the Lyft smartphone application to users located in North Carolina;

    c.  Collecting, storing, and monetizing data from North Carolina users, including geolocation data, ride histories, payment information, and safety-related information;

    d.  Charging, processing, and receiving payment from North Carolina residents for transportation services arranged through the Lyft platform;

    e.  Recruiting, onboarding, contracting with, and managing Lyft drivers who reside in and operate throughout North Carolina;

    f.  Advertising, promoting, and representing Lyft's transportation services to consumers in North Carolina through digital, mobile, and location-based marketing;

    g.  Deriving substantial revenue from rides occurring wholly or partly within North Carolina;

3

h. Exercising operational control over drivers and passengers located in North Carolina through Lyft's safety protocols, GPS tracking, ride-monitoring systems, and in-app communications; and

i. Engaging in continuous and systematic business activity sufficient to subject Lyft to personal jurisdiction in North Carolina courts.

22. Specific personal jurisdiction over Lyft is proper under North Carolina's long-arm statute, N.C. Gen. Stat. § 1-75.4(3) and satisfies due process of law because Lyft, directly and through its agents, representatives, contractors, and/or employees committed tortious acts within the State of North Carolina that caused or contributed to the Incident and Plaintiff's personal injuries.

23. Venue is proper in Mecklenburg County, North Carolina under N.C. Gen. Stat. §§ 1-80 and 1-82 because Lyft is a foreign corporation not incorporated or domiciled in North Carolina; the cause of action arose in North Carolina; and Plaintiff resides in Mecklenburg County. Accordingly, Plaintiff designates Mecklenburg County as the county of trial.

## FACTUAL BACKGROUND

27. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

28. Lyft operates a transportation network company in the business of providing ground transportation to the public through its mobile application (the "Lyft App"), which Lyft designed, controls, and operates.

29. Lyft controls driver onboarding, rider-driver matching, fare structure, payment processing, safety features, and the policies governing how rides are monitored and how safety incidents are handled.

30. Lyft passengers reasonably rely on Lyft's representations that drivers have been adequately screened, meaningfully monitored, and are capable of transporting passengers safely. Lyft profits from that trust and depends on it to sustain its business model and financial growth.

31. Lyft has long known that sexual harassment, unwanted sexual contact, and sexual assault/battery by drivers are recurring risks inherent in its model, yet Lyft has failed to implement reasonable and necessary safeguards to protect Lyft passengers, particularly women passengers from foreseeable sexual misconduct.

32. Lyft exercises substantial control over its drivers. Lyft controls access to riders, controls the matching process, sets fares, processes payments, collects a percentage of each ride, and retains the authority to suspend or deactivate drivers. Lyft drivers obtain access to riders solely through Lyft and on Lyft's terms.

4

33. Lyft has access to real-time trip data, GPS information, and ride-monitoring capabilities, yet fails to use these tools to prevent, detect, or intervene in unsafe or predatory driver behavior.

34. Lyft refuses to disclose prior complaints or misconduct by drivers to passengers, despite knowing that such information is material to rider safety.

35. Upon information and belief, Lyft's driver onboarding process is largely remote and materially less protective than vetting processes traditionally associated with for-hire transportation services.

36. Upon information and belief, Lyft drivers gain access to the Lyft platform and Lyft passengers by merely applying online, submitting identifying information electronically, and undergoing limited, third-party background checks that do not cross-reference national databases, involve no in-person vetting, or fingerprint-based criminal history screening, which falls short of the safeguards commonly implemented in other for-hire transportation companies in the transportation industry.

37. Upon information and belief, Lyft refuses to implement the aforementioned safeguards despite the known and foreseeable harm inherent in placing Lyft passengers alone in vehicles with inadequately screened Lyft drivers because doing so would impact the one thing Lyft prioritizes above all else, its profits.

38. Lyft's screening practices are designed for efficiency and reduced cost, not for the protection of riders placed alone in enclosed vehicles with drivers who gain access to them through Lyft's platform.

39. Sexual harassment, sexual propositions, unwanted sexual contact, sexual assault, and other predatory misconduct by Lyft drivers are known and recurring risks inherent in Lyft's business model which places riders in a confined vehicle under the control of Lyft drivers who are inadequately screened, hired, retained, trained, supervised, or otherwise monitored.

40. Upon information and belief, Lyft has failed to require anti-harassment or anti-sexual-misconduct training, failed to implement sufficient monitoring and intervention systems, failed to provide adequate warnings to riders, and failed to maintain a reporting and response system that functions as a real safety tool rather than a liability-management mechanism.

41. Instead of providing passengers with meaningful safety protections, Lyft shifts the responsibility away from itself and onto its riders, instructing victims, to simply "feel empowered" to end a ride if *they* feel unsafe, often only after riders have already been harmed.

5

42.  At the same time, Lyft forces passengers, both in real time and after being subjected to Lyft driver sexual misconduct, to navigate an ineffective customer service system that offers no real support or intervention.

43.  When Lyft passengers attempt to follow Lyft's instructions to report assault, harassment, or other sexual misconduct by its drivers, instead of being met with immediate help or human intervention, riders are met with a maze of dead ends, driven by AI-generated chat responses, inept customer service representatives accessible only through the Lyft App's chat feature, generic and/or fictitious webpages, automated forms, broken links, and false assurances about purported 24/7 emergency phone support, despite Lyft's failure to make any such emergency phone number readily accessible on its website or in its app.

44.  Upon information and belief, Lyft designed and maintained a reporting system which intentionally discourages, delays, and obstructs Lyft riders from obtaining meaningful help during or after dangerous encounters with Lyft drivers.

45.  Following reported incidents of Lyft driver sexual misconduct, Lyft fails to report the incidents to law enforcement and adds insult to injury by withholding basic identifying information, such as Lyft drivers' full names necessary for victims to accurately report the unlawful Lyft driver misconduct to law enforcement themselves.

46.  On or about February 25, 2025, Plaintiff used the Lyft App to request what she believed would be a safe ride to her destination.

47.  Plaintiff requested the ride in reliance on Lyft's platform, Lyft's safety representations, and Lyft's assurance that the drivers it permits to transport passengers are screened and reasonably safe to transport Lyft passengers.

48.  Lyft selected, approved, and dispatched Luther to Plaintiff through its platform, thereby placing Plaintiff alone in a vehicle with a driver Lyft had authorized to transport members of the public at the direction and for the benefit of Lyft.

49.  During the ride, Luther began making sexual advances toward Plaintiff, which included unwanted sexually charged physical contact and requests for sexual favors, despite Plaintiff being visibly shaken and refusing Luther's sexual advances.

50.  Luther's conduct during and at the end of the ride was harmful, sexually aggressive, and frightening as Plaintiff was alone in his vehicle and dependent upon him to complete the ride and allow her to exit safely.

51.  Luther started with unwelcome verbal remarks about Plaintiff's younger appearance.

6

52. As the ride came to an end, Luther grabbed Plaintiff and forcefully pulled Plaintiff toward him and asked Plaintiff to kiss him; Plaintiff unequivocally said no.

53. Luther then proceeded to ask Plaintiff to show him her breasts; and when Plaintiff, visibly shaken and afraid, refused, Luther tried to diminish what had just happened and absurdly said he was "not a stalker."

54. Luther's conduct was intentional, sexual, coercive, invasive, and unwelcome.

55. Luther sexually harassed Plaintiff, battered Plaintiff, degraded Plaintiff, and placed Plaintiff in imminent fear of further sexual attack.

56. The terror did not end at the ride's conclusion.

57. Because Luther knew where Plaintiff lived and because Lyft refused to provide identifying information which could have led to Luther's arrest, Plaintiff had to live with the ongoing fear Luther would return to her home to retaliate or subject her to additional harm on top of processing the trauma of what happened to her during her Lyft ride ("the Incident") with Luther.

58. As a direct and proximate result of the Lyft driver's conduct, Plaintiff suffered emotional distress, humiliation, fear, anxiety, and disruption of her sense of personal security and bodily autonomy.

59. After the Incident, Plaintiff was forced to navigate Lyft's inadequate and obstructive reporting system in an effort to seek recourse.

60. Rather than being given prompt access to a trained human representative, meaningful investigative support, or a clear reporting channel appropriate for Lyft driver sexual misconduct, Plaintiff was forced to deal with AI bots, automated systems, and chat-based customer service interactions that trivialized the seriousness of what had occurred.

61. Lyft's immediate response failed to protect Plaintiff, provide transparency, or initiate a visible and serious investigation; instead, Lyft refunded Plaintiff approximately six dollars for the ride.

62. Lyft offered Plaintiff no meaningful opportunity to pursue recourse through Lyft's systems, no transparent explanation of what action Lyft was taking, no adequate investigative update, and no proof that the driver had been promptly and completely removed from the platform or reported through any serious safety channel.

63. Plaintiff was left waiting for Lyft to "investigate."

7

64. Lyft failed to provide a meaningful avenue for follow-up and failed to provide the information necessary for Plaintiff to pursue criminal recourse in a timely and informed manner.

65. Lyft refused to provide Plaintiff with the driver's full name and other information necessary for Plaintiff to meaningfully pursue criminal recourse against Luther.

66. Plaintiff waited weeks for a response.

67. Eventually, a Lyft customer service representative called Plaintiff, but the call dropped.

68. No meaningful follow-up occurred.

69. Lyft's conduct after the incident further magnified Plaintiff's harm.

70. Lyft's public safety messaging and internal response structure are inconsistent.

71. Lyft portrays itself as safety-focused, but when confronted with serious sexual misconduct by one of its drivers, Lyft operates in a manner that is, upon information and belief, designed to contain liability, wear victims down, create delay, and reduce the likelihood of meaningful follow-through or potential liability.

72. Plaintiff's injuries and damages were the foreseeable result of Lyft's business model, Lyft's control of access between riders and drivers, Lyft's inadequate screening and monitoring practices, Lyft's misleading safety representations, and Lyft's failure to maintain a meaningful, accessible, trauma-informed response system for victims of sexual misconduct by drivers.

73. Lyft knew or should have known of the risk that Lyft drivers on its platform would sexually harass, batter, assault, proposition, intimidate, or otherwise prey upon female passengers placed alone in their vehicles.

74. Lyft consciously disregarded those known risks, upon information and belief, to avoid disrupting Lyft's profits and expansion.

75. As a direct and proximate cause of Defendant's negligent acts and omissions, the Incident occurred.

76. As a direct and proximate result of the Incident, Plaintiff suffered personal injuries and resulting damages in excess of $25,000.

77. Plaintiff is therefore entitled to recover damages from Lyft, including but not limited to, past and future medical expenses, pain and suffering, mental anguish and emotional distress, and loss of enjoyment of life.

8

78.     Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

79.     At all times relevant hereto, Defendant Lyft, Inc. ("Lyft") undertook to provide transportation services to the general public, including Plaintiff, through its mobile application, driver network, and ride-dispatch system, and in doing so owed Plaintiff a duty to exercise reasonable care for her safety, protection, and wellbeing.

80.     By inviting members of the public to enter vehicles operated by drivers selected, dispatched, authorized, and controlled through Lyft's platform, Lyft owed a duty to use reasonable care in the screening, onboarding, retention, monitoring, supervision, control, investigation, and removal of drivers using its platform.

81.     Lyft further owed Plaintiff a duty to use reasonable care in the design, implementation, and operation of its safety systems, reporting systems, and post-incident response procedures, particularly where Lyft knew that passengers are placed in a uniquely vulnerable position inside a driver-controlled vehicle.

82.     Lyft knew or should have known that passengers using its platform are dependent upon Lyft and its drivers for safe transportation and that such passengers are exposed to an unreasonable risk of harm where Lyft fails to adequately vet, supervise, monitor, and control the drivers to whom it gives access to those passengers.

83.     For at least a decade before the incident involving Plaintiff, Lyft knew or should have known that drivers using its platform had engaged in sexual harassment, sexual propositions, unwanted sexual touching, battery, assault, stalking, intimidation, and other predatory or assaultive sexual misconduct toward passengers.

84.     Lyft knew or should have known that such sexual misconduct was not merely theoretical or isolated but was a recurring and foreseeable danger associated with its business model, which places passengers in enclosed vehicles, often alone, under the control of drivers who gain access to them solely by virtue of Lyft's platform.

85.     Despite this knowledge, Lyft failed to take reasonable measures to protect Plaintiff from foreseeable sexual misconduct by drivers operating through its platform.

86.     Lyft failed to adequately screen and vet drivers before authorizing them to transport passengers through the Lyft platform.

87. Lyft failed to implement and enforce safety procedures reasonably calculated to deter, detect, prevent, and respond to sexual harassment, assaultive behavior, coercive conduct, and other dangerous misconduct by Lyft drivers.

88. Lyft failed to adequately monitor drivers using its platform, failed to use available ride data and technological tools in a reasonably careful manner to protect riders, and failed to intervene through reasonable policies, design choices, and oversight mechanisms to reduce the risk of Lyft driver misconduct.

89. Lyft failed to adopt and maintain a meaningful, accessible, transparent, and trauma-informed reporting system for passengers who are sexually harassed, assaulted, battered, degraded, or placed in fear by Lyft drivers.

90. Lyft failed to maintain a post-incident response system reasonably designed to protect victims, preserve relevant information, facilitate law enforcement recourse, and promptly investigate and address serious complaints of sexual misconduct.

91. Lyft failed to provide adequate warnings to Plaintiff and the riding public concerning the nature and extent of the danger posed by sexual harassment, sexual assault, battery, and other predatory misconduct by drivers using Lyft's platform.

92. Lyft held itself out to Plaintiff and the public as a safe means of transportation while failing to implement safety protections and response systems reasonably commensurate with the known risks inherent in its platform.

93. Lyft knew or should have known that a male driver placed alone in a vehicle with a female passenger could exploit that isolation, confinement, and power imbalance to engage in sexual advances, unwanted touching, sexual coercion, assaultive conduct, and fear-inducing sexual misconduct.

94. Lyft knew or should have known that the moment near the end of a ride, when a passenger is preparing to exit the Lyft driver's car and remains physically confined in close proximity to the driver, and must still make it from the Lyft driver's car to the safety of her home, is a particularly vulnerable period requiring reasonable protective systems, policies, monitoring, and accountability.

95. Lyft nevertheless failed to adopt, implement, and enforce reasonable measures to protect passengers, including Plaintiff, from the known and foreseeable risk that a driver would use the ride itself, the privacy of the vehicle, and the moment before and/or during exit to engage in sexual misconduct.

10

96. On or about February 25, Plaintiff used Lyft's platform to obtain transportation and was entitled to expect that Lyft had exercised reasonable care in selecting, authorizing, monitoring, and retaining the driver assigned to her.

97. Instead, during the ride, Luther, Lyft's driver, made sexual advances toward Plaintiff and requested things of a sexual nature that were unacceptable, degrading, and plainly unwelcome.

98. As a direct and foreseeable consequence of Lyft's failures, Plaintiff suffered sexualized physical and coercive misconduct at the hands of a Lyft driver operating through Lyft's platform.

99. Lyft's negligence did not end with the sexually assaultive conduct itself.

100. After Plaintiff reported what had happened, Lyft failed to respond in a manner consistent with reasonable care for the protection of a passenger reporting sexual misconduct by a driver.

101. Rather than providing Plaintiff with prompt access to a trained human representative, meaningful investigative support, transparent follow-up, and information reasonably necessary to protect herself and pursue legal recourse, Lyft forced Plaintiff to navigate automated systems, chat-based customer service, delay, opacity, and inadequate responses.

102. Lyft's response to Plaintiff included refunding approximately six dollars for the ride.

103. Plaintiff waited weeks for meaningful follow-up from Lyft in hopes she would get information necessary to take legal action, including pursuing criminal charges.

104. When a Lyft representative finally contacted Plaintiff, the call dropped, and Lyft failed to provide meaningful follow-up thereafter.

105. Lyft failed and refused to provide Plaintiff with the driver's full identifying information and failed to provide a meaningful, transparent pathway for Plaintiff to pursue criminal recourse in a timely and informed manner.

106. Lyft knew or should have known that forcing a victim of driver sexual misconduct into bots, scripted chats, delayed callbacks, and opaque support channels would foreseeably compound that victim's distress, undermine accountability, and increase the risk that predatory drivers would escape meaningful consequences.

11

107. Lyft's conduct after the incident magnified Plaintiff's injuries by diminishing the seriousness of what occurred, impeding meaningful recourse, and reinforcing Plaintiff's fear, distress, helplessness, and loss of safety.

108. Lyft's acts and omissions, as alleged herein, constituted breaches of the duties of reasonable care Lyft owed to Plaintiff.

109. Lyft's acts and omissions, as alleged herein, were negligent, careless, and reckless.

110. Lyft's conduct, as alleged herein, was willful and wanton, and demonstrated conscious and reckless disregard for the safety, rights, and dignity of passengers such as Plaintiff.

111. As a direct and proximate result of Lyft's negligence and gross negligence, Plaintiff was sexually harassed, sexually propositioned, assaulted, battered, degraded, and placed in imminent fear of further sexual attack by a Lyft driver operating through Lyft's platform.

112. As a direct and proximate result of Lyft's negligence and gross negligence, Plaintiff suffered humiliation, fear, emotional distress, anxiety, mental anguish, loss of personal security, loss of bodily autonomy, and disruption of her dignity.

113. As a direct and proximate result of Lyft's negligence and gross negligence, Plaintiff suffered personal injuries and resulting damages in excess of $25,000.

114. Plaintiff is therefore entitled to recover damages from Lyft, including but not limited to, past and future medical expenses, pain and suffering, mental anguish and emotional distress, and loss of enjoyment of life.

**SECOND CAUSE OF ACTION**
**(Negligent Hiring, Retention, and Supervision)**

115. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

116. At all relevant times, Lyft undertook to recruit, screen, approve, authorize, retain, train, monitor, and supervise drivers, permitted to transport passengers through the Lyft platform, including Luther.

117. Luther was unfit and incompetent to transport passengers for Lyft safely, lawfully, and without sexual harassment, unwanted physical contact, intimidation, coercion, or sexualized misconduct.

118. Lyft knew or, in the exercise of ordinary care, should have known that Luther was unfit or incompetent to safely transport passengers through Lyft's platform.

12

119. Upon information and belief, Lyft had access to driver-account data, trip history, rider complaints, safety reports, customer service records, and other platform information that could have revealed Luther's unfitness had Lyft exercised reasonable care.

120. Lyft failed to exercise reasonable care in hiring, screening, approving, retaining, training, monitoring, and supervising Luther.

121. Lyft also knew or should have known that inadequately screened, trained, monitored, or supervised drivers posed a foreseeable risk of sexual harassment, unwanted physical contact, assaultive conduct, and fear of sexual battery to female passengers riding alone.

122. Lyft's acts and omissions, as alleged herein, constituted breaches of the duties of reasonable care Lyft owed to Plaintiff.

123. Lyft's acts and omissions, as alleged herein, were negligent, careless, and reckless.

124. Lyft's conduct, as alleged herein, was willful and wanton, and demonstrated conscious and reckless disregard for the safety, rights, and dignity of passengers such as Plaintiff.

125. As a direct and proximate result of Lyft's negligence and gross negligence in the hiring, screening, approving, retaining, training, monitoring, and supervising of Luther, Plaintiff was sexually harassed, sexually propositioned, assaulted, battered, degraded, and placed in imminent fear of further sexual attack by a Lyft driver operating through Lyft's platform.

126. As a direct and proximate result of Lyft's negligence and gross negligence in the hiring, screening, approving, retaining, training, monitoring, and supervising of Luther, Plaintiff suffered humiliation, fear, emotional distress, anxiety, mental anguish, loss of personal security, loss of bodily autonomy, and disruption of her dignity.

127. As a direct and proximate result of Lyft's negligence and gross negligence in the hiring, screening, approving, retaining, training, monitoring, and supervising of Luther, Plaintiff suffered personal injuries and resulting damages in excess of $25,000.

128. Plaintiff is therefore entitled to recover damages from Lyft, including but not limited to, past and future medical expenses, pain and suffering, mental anguish and emotional distress, and loss of enjoyment of life.

## THIRD CAUSE OF ACTION
### (Common Carrier Negligence)

129. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

13

130. N.C. Gen. Stat § 62-3(6) defines a "common carrier" as any person or entity "which holds itself out to the general public to engage in the transportation by motor vehicle in intrastate commerce of persons or household goods or any class or classes thereof for compensation [. . .]."

131. At all times relevant hereto, Lyft held itself out to the general public as a transportation provider and, in operating its rideshare platform, functioned as a common carrier for hire, offering transportation services to the public at large through its Lyft application in exchange for compensation.

132. Lyft provides transportation services through a digital application available to any member of the public who downloads the application, creates an account, and requests a ride. Lyft matches riders with drivers for profit, sets and collects fares, and controls the essential infrastructure through which transportation is arranged and executed.

133. Lyft offers on-demand transportation to the general public on standardized terms, thereby holding itself out as a transportation provider to all persons seeking safe conveyance.

134. For the above-mentioned reasons, Lyft is a common carrier subject to heightened duty requirements to its passengers.

135. At the time of the Incident, Plaintiff was a fare-paying passenger utilizing Lyft's transportation service and was owed the heightened duties imposed upon a common carrier under North Carolina law, including the duty to protect.

136. As a common carrier, Lyft owed Plaintiff the highest degree of care, vigilance, and foresight for her safety consistent with the practical operation of its business, including the duty to do all that human care, caution, and reasonable precaution could reasonably accomplish to protect Plaintiff from harm.

137. Lyft further owed Plaintiff a duty to provide safe transportation, including protection from foreseeable harm inflicted by drivers operating under Lyft's authority, control, and platform.

138. Lyft knew or should have known that passengers using its service are placed in a uniquely vulnerable position, alone in a confined vehicle operated by a driver selected and dispatched through Lyft's system, and dependent upon that driver for safe transportation to their destination.

139. Lyft knew or should have known that this confined and controlled environment creates a foreseeable risk that certain drivers would exploit their access to passengers for sexual harassment, unwanted sexual advances, coercion, nonconsensual physical contact, sexual assault, and other predatory misconduct.

14

140. Lyft failed to exercise the heightened degree of care required of a common carrier to protect its passengers from foreseeable harm, including harm of the type suffered by Plaintiff.

141. Lyft failed to implement reasonable safety precautions consistent with the highest degree of care, including but not limited to adequate driver screening, adequate supervision, adequate training, meaningful monitoring, and effective intervention systems designed to prevent the type of harm Plaintiff suffered.

142. Lyft failed to ensure that Luther and other Lyft drivers would refrain from sexual harassment, sexual coercion, unwanted physical contact, or any form of assaultive conduct toward passengers, including Plaintiff.

143. Lyft failed to provide a reliable and effective system to immediately address in-ride misconduct, including sexual harassment or assault, in a manner consistent with its obligations as a transportation provider carrying vulnerable passengers.

144. Lyft failed to adequately warn passengers, including Plaintiff, of the known and foreseeable risks associated with rideshare transportation, including prior complaints and incidents involving sexual misconduct by drivers operating through its platform, including Luther.

145. Lyft failed to take reasonable or adequate steps to protect female passengers, including Plaintiff, who are foreseeably at greater risk of sexual exploitation while confined in a vehicle controlled by Lyft drivers, including Luther.

146. Lyft failed to exercise the utmost care and vigilance required under common carrier principles to ensure that Plaintiff would be transported safely and without exposure to sexual harassment, assault, or physical violation by its driver, Luther.

147. Luther's conduct constituted nonconsensual physical contact, sexual coercion, and assaultive behavior occurring during the course of Plaintiff's transportation arranged by and fulfilled using Lyft's App and Lyft's driver.

148. At all relevant times, Plaintiff was a captive passenger in a moving or recently stopped vehicle, dependent upon Lyft and its driver, Luther, for safe exit, and unable to fully control her environment or Luther's conduct.

149. Lyft failed to safely transport Plaintiff, in violation of its duty as a common carrier, and instead placed her in the custody and control of a driver who subjected her to sexual harassment, intimidation, and coercive sexual misconduct.

150. Lyft's failure to exercise the heightened degree of care required of a common carrier, including but not limited to Lyft's failure to protect Plaintiff from the harms alleged herein,

15

was a direct and proximate cause of Plaintiff's sexual harassment, sexual assault, and battery by Luther.

151. Lyft's acts and omissions, as alleged herein, were negligent, careless, and reckless.

152. Lyft's conduct, as alleged herein, was willful and wanton, and demonstrated conscious and reckless disregard for the safety, rights, and dignity of passengers such as Plaintiff.

153. As a direct and proximate result of Lyft's common carrier negligence and gross negligence, Plaintiff was sexually harassed, sexually propositioned, assaulted, battered, degraded, and placed in imminent fear of further sexual attack by a Lyft driver operating through Lyft's platform.

154. As a direct and proximate result of Lyft's common carrier negligence and gross negligence, Plaintiff suffered humiliation, fear, emotional distress, anxiety, mental anguish, loss of personal security, loss of bodily autonomy, and disruption of her dignity.

155. As a direct and proximate result of Lyft's common carrier negligence and gross negligence Plaintiff suffered personal injuries and resulting damages in excess of $25,000.

156. Plaintiff is therefore entitled to recover damages from Lyft, including but not limited to, past and future medical expenses, pain and suffering, mental anguish and emotional distress, and loss of enjoyment of life.

### FOURTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress)

157. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

158. Lyft had long been aware that female passengers had been sexually harassed, assaulted, and placed in fear for their safety by Lyft drivers for nearly a decade before the incident involving Plaintiff.

159. Despite this knowledge, Lyft chose not to adopt effective measures to screen drivers, monitor their conduct, or remove drivers who posed a danger, knowing its limited background checks, lack of biometric verification, and minimal monitoring created a foreseeable risk of harm.

160. Lyft declined to implement reasonable safety precautions, such as enhanced background checks, fingerprint verification, real-time monitoring, in-vehicle cameras, or cooperation with law enforcement, because doing so would increase costs and create reputational risks for Lyft.

16

161. Lyft failed to adopt additional protections, including but not limited to, continuous driver monitoring, immediate termination for sexual misconduct, a functional reporting system, and adequate review of complaints by trained personnel.

162. Lyft failed to adequately warn passengers that such protections were absent.

163. Lyft knew its reporting mechanisms were ineffective and emotionally harmful, routing victims through automated bots, scripted agents, and misleading links, including a non-existent phone line for immediate assistance for victims marketed on Lyft's webpage, leaving victims without support or meaningful follow-up.

164. By failing to implement reasonable safety measures, Lyft breached its duty of care, negligently inflicted severe emotional harm on Plaintiff, and acted recklessly and in conscious disregard of her physical safety and mental wellbeing.

165. Lyft's acts and omissions, as alleged herein, were negligent, careless, and reckless.

166. Lyft's conduct, as alleged herein, was willful and wanton, and demonstrated conscious and reckless disregard for the safety, rights, and dignity of passengers such as Plaintiff.

167. As a direct and proximate result of Lyft's negligence and gross negligence, Plaintiff suffered severe and lasting psychological harm and emotional distress.

168. As a direct and proximate result of Lyft's negligence and gross negligence Plaintiff suffered personal injuries and resulting damages in excess of $25,000.

169. Plaintiff is therefore entitled to recover damages from Lyft, including but not limited to, past and future medical expenses, pain and suffering, mental anguish and emotional distress, and loss of enjoyment of life.

## FIFTH CAUSE OF ACTION
### (Vicarious Liability for Lyft Driver's Torts)

170. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

171. At all relevant times, the Lyft driver, Luther, who sexually harassed, assaulted, battered, and placed Plaintiff in imminent fear of further sexual attack was acting for and on behalf of Lyft in connection with a ride arranged, controlled, dispatched, and profited from by Lyft through the Lyft App.

172. Lyft's liability for the acts of its drivers, including Luther, arises under applicable principles of actual agency, apparent agency, agency by estoppel, and respondeat superior.

17

173. Plaintiff is informed and believes, and on that basis alleges, that Lyft retained and exercised substantial control over the instrumental details of Lyft drivers', including Luther's, work, including but not limited to, approving drivers to access the Lyft platform; controlling which riders drivers receive; dictating or materially controlling fare structure and payment processing; controlling the ride interface through which drivers and riders interact; tracking ride data, routes, and locations through the Lyft App; receiving complaints and safety reports concerning drivers; and retaining the right to investigate, suspend, discipline, and deactivate drivers at any time.

174. Luther obtained access to Plaintiff solely because Lyft authorized him to drive on its platform, matched him with Plaintiff through the Lyft App, dispatched the ride, controlled the transaction, and collected revenue from the ride at issue.

175. Lyft placed Luther in a position of authority, trust, proximity, and control over Plaintiff by selecting him through its platform, sending him to transport Plaintiff, providing him access to her destination information, and placing Plaintiff alone in his vehicle under circumstances in which she was dependent on him for transportation and safe exit.

176. Luther's tortious conduct was directly connected to, related to, and facilitated by the agency and/or employment relationship and by the authority, access, control, and opportunity Lyft conferred upon him. The misconduct occurred during and/or immediately upon the completion of a Lyft-arranged ride, inside the vehicle used for the ride, while Plaintiff remained in the vulnerable position Lyft's transportation arrangement created.

177. The driver's ability to isolate Plaintiff, learn where she lived, subject her to unwelcome sexual advances, assault, and battery, and place her in fear of further sexual harm arose directly from the role Lyft assigned him and the transportation relationship Lyft created and controlled.

178. Plaintiff is informed and believes, and on that basis alleges, that at all relevant times Luther was Lyft's actual agent, servant, employee, representative, and/or person acting on Lyft's behalf in carrying out Lyft's passenger-transportation business.

179. In the alternative, Lyft held Luther out as acting on its behalf and as part of Lyft's transportation service. Lyft branded the ride as a Lyft ride, required Plaintiff to use Lyft's App to request transportation, matched Plaintiff with Luther, directed Plaintiff to the assigned vehicle, processed Plaintiff's payment, and represented to Plaintiff and the public that Lyft's rides and drivers were part of Lyft's transportation and safety system.

180. Plaintiff reasonably believed that Luther was acting for Lyft and as Lyft's authorized transportation representative. Plaintiff relied on Lyft's manifestations, including Lyft's branding, dispatch system, fare collection, safety messaging, and control over the ride, in entering Luther's vehicle and accepting transportation through Lyft's platform.

181. As a direct and proximate result of Luther's tortious conduct, for which Lyft is vicariously liable, Plaintiff suffered personal injuries and resulting damages in excess of $25,000.

18

182. Plaintiff is therefore entitled to recover damages from Lyft, including but not limited to, past and future medical expenses, pain and suffering, mental anguish and emotional distress, and loss of enjoyment of life.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays unto the Court for the following relief:

1. Plaintiff be awarded in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) for her compensatory, general, and special damages;
2. Plaintiff be awarded punitive damages to the extent allowed by law;
3. All costs of this action be taxed against Defendant;
4. Plaintiff recover attorneys' fees;
5. Plaintiff has a jury trial on all issues so triable; and
6. For such other and further relief as the court deems just and proper.

Respectfully submitted this the 27th day of May 2026.

**THE PAYNE FIRM, P.C.**
*Attorneys for Plaintiff*

By: */s/ Sierra Robertson*
**Sierra Robertson**
N.C. State Bar No. 64169
THE PAYNE FIRM, P.C.
112 South Tryon Street, Ste. 1560
Charlotte, NC 28202
Phone: 704.529.9000
Fax: 704.900.6021
srobertson@paynelawfirm.com AND

By: */s/Jason E. Payne*
**Jason E. Payne**
N.C. State Bar No. 56212
112 South Tryon Street, Ste. 1560
Charlotte, NC 28202
Phone: 704.529.9000
Fax: 704.900.6021
jpayne@paynelawfirm.com

19